UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION at LEXINGTON**

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| Plaintiff, ) | Action No. 5:12-CR-102-9-JMH |
| ) | |
| v. ) | |
| ) | |
| SETH J. JOHNSTON. ) | **MEMORANDUM OPINION AND ORDER** |
| ) | |
| Defendant. ) | |

\*\*   \*\*   \*\*   \*\*   \*\*

This matter is before the Court on Defendant Seth Johnston's Motion to Produce alleged Co-Conspirator Hearsay Statements and conduct an *Enright*, pretrial evidentiary hearing [DE 197], which is ripe for review following the government's Response [DE 208] and Johnston's Reply [DE 210].

Also pending before the Court is Johnston's Motion pursuant to Fed. R. Crim. P. 14(a) to sever Count 6, charging that Johnston knowingly attempted to corruptly persuade a potential witness a violation of 18 U.S.C. § 1512(b)(3), from the remaining charges at trial [DE 198]. The government has responded [DE 207], and Johnston timely filed a reply [DE 209]. This matter is also ripe.

**I. Factual Background**

Zafar Nasir, Asim Malik, and Nawaz Khan, allegedly

1

acquired and distributed controlled substance analogues, specifically, two brands of synthetic marijuana, containing JWH-122, a controlled substance analogue of the Schedule I controlled substance JWH-018, from Hosam Saad Al-Baderi, Victor Manuel Collindres Hernandez, and Soha Aljeanabi, who allegedly manufactured and distributed the product from Las Vegas, Nevada. Once the synthetic marijuana was in Lexington, Nasir, Malik, and Khan allegedly distributed the product in their gas stations, convenience stores, and "smoke shops." The government alleges that, in early 2012, Johnston financed the acquisition of the two types of synthetic marijuana.

After Malik had been arraigned on the charges contained in the indictment, Johnston and Malik engaged in a conversation, the substance of which formed the basis, at least in part, for Count 6 in the indictment.[1] A recording of this conversation was obtained by law enforcement.

During the recording, Johnston asked Malik, "What did you tell them about the $100,000 that went to JABN?" Malik responded, "I told them that we did it for the incense." [DE 170 at 549.] Johnston then stated, "If you tell them the same thing, then they are going to indict me." [DE 170 at 549.]

---

[1] The factual allegations surrounding Count 5, based on Johnston's alleged false statement to a federal agent, are not material to the motions herein and are, therefore, not discussed in any detail.

2

According to the Government's brief, Malik, during the recording, made a comment that he wanted to tell his lawyer what their intention was. Johnston stated, "How are they going to find out what our intention was?" [Government's Brief, DE 207 at 4.] Johnston continued, "If everybody's story is the same . . . I am not asking you take the fall for me here." [DE 170 at 549.] Malik said he told his attorney truthfully what the relationship was. Johnston said he had to stand trial on that, and "If they charge me, I have to say that I didn't know." [DE 170 at 549-50.] Later, Johnston stated, "They are going to ask if I had any connection with the incense. What are you going to do then?" Malik said he would tell them that Johnston provided the money. [DE 170 at 550.] Johnston then said, "They know I invested in your gas stations and tided you guys over in some of those things." Khan suggested that "we all just tell the truth and fight it together," to which Johnston responded, "that just puts us all in a worse position." [DE 170 at 550.]

As reflected on the recording, a short time later, Johnston stated, "If they ask you if I had anything to do with it, just say nothing. They are going to ask you about incense, they are going to call it synthetic marijuana." [DE 170 at 550.] Johnston continued, "The only way they can get me is with you guys." [DE 170 at 550-51.] Johnston later said, "So

3

what, I moved $100,000 into an account." [DE 170 at 551.] The government alleges that this statement was made in the context of what he would say when asked about the $100,000 investment for the "incense." [Government's Brief, DE 207 at 4-5] Johnston continued, "If you guys say what you said in here, they will . . . that's what they are waiting for. Somebody to say that I knew, that I had knowledge that the money was going for a certain purpose, and the intent that it go for that purpose." [DE 170 at 551.] Johnston concluded that "They don't know anything yet," about the $100,000 for the synthetic marijuana.

In addressing how to answer questions about the $100,000 for the synthetic marijuana, Johnston stated, "The only thing I am asking you is my knowledge. If I didn't know what it was for, if I was just doing it as a loan and I trusted you guys, it would put me in a much better position." He continued, "It doesn't hurt you guys." [DE 170 at 551.] Later, Johnston stated, "The only way they can put me with knowledge is if you guys say I had knowledge and intent." [DE 170 at 551.] "If you guys don't testify . . . there is no way for the jury to infer intent or knowledge that it is an illegal product without somebody saying we intended to go buy incense." [DE 170 at 551-52.]

Johnston further stated in referring to himself, "Look,

4

if I had my way 100 percent, you guys would go say that he didn't know what it was for, that he was just funding a gas station." [DE 170 at 552.]  Johnston reiterated to "just say nothing." [DE 170 at 552.]  Johnston also asked "do you want me to do something for the $100,000?" According to the Government, given the context of this conversation, this statement to mean that Johnston would create a false document regarding the $100,000.  Toward the end of the conversation, Johnston stated, "They can put you on the witness stand and say that 'Seth knew what this money was for." [DE 170 at 551.] "The only way they get the knowledge and intent is by what you tell them." [Government's Brief, DE 207 at 5-6]  "Will you trade your life for mine?" [DE 170 at 552.]  In response, Malik stated, "Look, I'd rather answer truthfully what I know, but since you are saying that, I won't answer that question." [DE 170 at 551.]

     Additionally, there are a series of text messages between Malik and Johnston that were obtained.  One conversation on January 6, 2012 at 10:39 is reported as follows:

```
    Johnston: Why is Sammy asking me about spice.
    Malik:    He does not know anything about your
involvement. Probably just getting your advice on it.
    Malik:    Legality of it I guess.
    Malik:    He is going to the Louisville market for us.
    Johnston: He says he's having problems.
    Malik:    He told us about that. It will take him 2 to 3
visits to convince people to [buy] from him, because they r
buying it from someone else already.
```

5

>    Malik: Once he goes with the product, I am pretty sure he will b able to make customers. He is a good salesman, if he is the same old Sami [from] 5 years ago.
>    Johnston: No doubt.

[United States' Response Brief, DE 207 at 6.]

Additionally, during his review of the text messages, Detective Gibbons discovered the following text messages between Malik and Johnston on January 24, 2012 at approximately 10:04 a.m.

>    Malik: We got delivery.
>    Johnston: Vegas?
>    Malik: yes

[United States' Response Brief, DE 207 at 7.]

### II. Motion to Produce to conduct an *Enright* hearing

Johnston requests that the government produce any statements alleged co-conspirator statements[2] and that the Court conduct a pretrial evidentiary hearing as allowed by *United States v. Enright*, 579 F.2d 980 (6th Cir. 1978). For an out-of-court co-conspirator statement to be admissible, "the offering party must establish by a preponderance of the evidence that a conspiracy existed, that the defendant was a member of the conspiracy, and that the coconspirator's statement was made during the course and in furtherance of the

---

[2] The government has already provided Johnston with the recorded conversation referenced herein and made Johnston aware of the two sets of text messages that it will seek to introduce. No other co-conspirator statements were referenced by the government.

6

conspiracy." *United States v. Kelsor*, 665 F.3d 684, 693 (6th Cir. 2011) (citing *United States v. Wilson*, 168 F.3d 916, 920 (6th Cir. 1999)).

The government will seek to introduce the taped conversation between Malik and Johnston as admissions under Fed. R. Evid. 801(d)(2)(A) and, thus, the admissibility of the text messages between Malik and Johnston as co-conspirator statements under Fed. R. Evid. 801(d)(2)(E) are the only statements at issue for purposes of this motion.

Because the "trial judge must have considerable discretion in controlling the mode and order of proof at trial and his rulings should not cause reversal of a criminal conviction unless they affect substantial rights," the Sixth Circuit has declined to set out "hard and fast" procedures for determining the admissibility of such co-conspirator statements under Rule 801(d)(2)(E). *United States v. Vinson*, 606 F.2d 149, 152 (6th Cir. 1979). There are three possible alternatives available to the trial court. The Court may conduct a "mini-hearing" outside the presence of the jury, where the Court hears the government's proof of conspiracy and makes the preliminary finding." *Enright*, 579 F.2d at 980; *Vinson*, 606 F.2d at 152. However, the Sixth Circuit has acknowledged that this procedure "has been criticized as burdensome, time consuming and uneconomic." *Vinson,* 606 F.2d

7

at 152.

The Court may also require the government to first establish the conspiracy by a preponderance of the evidence through independent evidence at trial before making the preliminary *Enright* findings.  *Vinson,* 606 F.2d at 152–53.  Finally, the Court may admit the statements "subject to later demonstration of their admissibility by a preponderance of the evidence." *Vinson,* 606 F.2d at 152–53.  In this instance, the Court determines that conditionally admitting the text statements will be the most efficient method, and the method that appears to be most widely used in this circuit.  See *United States v. Coffman*, 5:09-cr-181-KKC, 2010 WL 3924671 *3 (E.D.Ky. September 29, 2010); *United States v. Holloway*, 740 F.3d 1373, 1375 n. 2 (6th Cir. 1984) (recognizing that this option is "firmly entrenched in this circuit's practice"). Considering the type of statements at issue, and the definite time at which they were made, a full *Enright* hearing does not appear to be necessary.  This Court should be able to ascertain their admissibility under Fed. R. Evid. 801(d)(2)(E) at trial.

Accordingly, these text statements will be conditionally admitted subject to a later demonstration of their admissibility by a preponderance of the evidence at the close of the government's case-in-chief.  Thus, the government is

cautioned that if it fails to carry its burden by a preponderance of the evidence, this Court will grant a mistrial in this matter unless convinced that a cautionary instruction would shield the defendant from prejudice. *United States v. Kelsor*, 665 F.3d 684, 693 (6th Cir. 2011).

### III. Motion to Sever Count 6 at Trial

Johnston argues that he will be prejudiced by the joint trial of these charges because a jury is likely to confuse the conspiracy and corrupt persuasion charges, that his defenses are antagonistic, and that Johnston's right to invoke his Fifth Amendment privilege is compromised, as well as his right to call witnesses in defense of the corrupt persuasion charge. The government points out that these claims are logically interrelated, that evidence regarding the two groups of claims against Johnston will necessarily involve the same facts and witnesses and they are connected to the same common scheme or plan. The government argues there is no overwhelming consideration requiring severance of this matter and, thus, severance is within the Court's discretion.

Initially, it is worth noting that, under Fed. R. Crim. P. 8(a) & 8(b), joinder of the conspiracy and witness tampering charges and joinder of these defendants is proper given that the charges arise out of the "same act or transaction or series of acts or transactions" and these rules

9

should be construed in favor of joinder. *United States v. Hatcher*, 680 F.2d 438, 440-41 (6th Cir. 1982). "[W]hen defendants properly have been joined under Rule 8(b), a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). In *United States v. Montgomery*, 358 F. App'x 622, 627-28 (6th Cir. 2009), the Sixth Circuit found that joinder of drug conspiracy charges with post-indictment witness tampering charges was proper because the crimes were interrelated. The charges were related because, even though the corrupt persuasion occurred after Montgomery and his co-defendant were in jail, Montgomery had hoped that by changing the witness' testimony he could avoid a conviction for the drug offenses. *Montgomery*, 358 F.App'x at 628.

A motion to sever is within the discretion of the trial court. *United States v. Wirsing,* 719 F.2d 859, 864 (6th Cir. 1983) "Foremost among the [ ]circumstances [relevant to a motion to sever] is a balancing of the interest of the public in avoiding a multiplicity of litigation and the interest of the defendant in obtaining a fair trial." *Wirsing,* 719 F.2d at 864-65; *United States v. Saadey*, 393 F.3d 669, 678 (6th

10

Cir. 2005).

A defendant seeking severance bears the "heavy burden of showing specific and compelling prejudice." *United States v. Causey*, 834 F.2d 1277, 1287 (6th Cir. 1988)(citing *United States v. Bibby*, 752 F.2d 1116, 1123 (6th Cir. 1985)). Johnston argues that because Malik and he have mutually antagonistic defenses, he will be prejudiced if he and Malik are tried together and Count 6 is part of that trial. However, "[m]utually antagonistic defenses are not prejudicial per se." *Zafiro*, 506 U.S. at 538. Even if prejudice is demonstrated, it is within the discretion of the court to tailor appropriate relief, such as limiting instructions. *Zafiro*, 506 U.S. at 539.

In this circumstance, the nature of the mutually antagonistic defenses are such that a limiting instruction will be sufficient to address the possible prejudice arising from trying Johnston on charge 6 along with the other charges. Johnston argues that there is a potential "spillover" effect of the other charges on the corrupt persuasion charge against Johnston. However, the jury will be able to discern the evidence presented on the corrupt persuasion charge from evidence on the other charges against the other defendants with the assistance of a limiting instruction.

Johnston also argues that the joint trial of Charge 6

11

creates a *Bruton* issue. "*Bruton* held that a defendant is deprived of his rights under the Confrontation Clause when his nontestifying codefendant's confession naming him as a participant in the crime is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant." *McGhee v. Yukins*, 229 F.3d 506, 511 (6th Cir. 2000). Specifically, if Malik's statements implicating Malik in the conspiracy are admitted at a joint trial, but he chooses not to testify by invoking his privilege against self-incrimination, then Johnston's rights to confrontation under the Constitution would be violated. By severing the trial, Johnston argues, he would be free to call Malik and Khan in defense of Charge 6 regarding corrupt persuasion. Based on the information available, the Court agrees that this case presents a *potential* violation of Johnston's rights under the confrontation clause, and that the potential for prejudice may not be remedied by redaction. *Stanford v. Parker*, 266 F.3d 442, 456 (6th Cir. 2001) (where a Bruton situation exists, the court may protect. . . by (1) exclusion of the confession, (2) severance of the trial, or (3) redaction of the confession to avoid mention or obvious implication of the non-confessing defendant.") However, the Court declines to sever the trial on Count 6 at this time.

As the parties prepare for trial, if it appears that the

12

*Bruton* issue may remain, Johnston may raise it at that time. Johnston may file another motion to sever Count 6 based on the *Bruton* issue no later than one week prior to trial.

For the foregoing reasons, **IT IS ORDERED** that

(1) Johnston's Motion to Produce alleged Co-Conspirator Hearsay Statements and conduct an *Enright* evidentiary hearing [DE 197] is **DENIED**; and

(2) Johnston's Motion to sever Count 6 at trial [DE 198] is **DENIED**, but Johnston may raise the *Bruton* issue again no later than one week prior to trial.

This the 8th day of July, 2013.



Signed By:
*Joseph M. Hood*
Senior U.S. District Judge

13